UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FRANK CALABRESE, | ) | |
| | ) | |
| Plaintiff, | ) | 14 C 3455 |
| | ) | |
| v. | ) | Judge Gary Feinerman |
| | ) | |
| KIMBERLY FOXX, Cook County State's Attorney, in her official capacity, LEO SCHMITZ, Illinois State Police Director, in his official capacity, ANDREANA TURANO, GLEN RUNK, MELISSA HOWLETT, JENNIFER DEPASTORS, VICTORIA POKLOP, MICHAEL HEENE, CHARLES AKIN, SCOTT MORETH, and the CITY OF DES PLAINES, | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Frank Calabrese brings this suit against four members of the Cook County State's Attorney Office, the City of Des Plaines, five Des Plaines police officers, and the Director of the Illinois State Police, alleging violations of the federal and state constitutions in connection with his arrest, prosecution, and conviction for violating an order of protection. Doc. 156. After Calabrese twice amended his complaint, Docs. 5, 37, the court stayed the suit under the *Younger* doctrine pending resolution of his state criminal trial. Doc. 62. While the suit was stayed, Calabrese sought and was granted leave to file a third amended complaint. Docs. 81, 83. The court lifted the stay after Calabrese was convicted, and granted him leave to file a fourth amended complaint. Docs. 147, 156.

The State's Attorney Defendants move under Federal Rule of Civil Procedure 12(b)(6) to dismiss all claims against them, the Des Plaines Defendants move under Rule 12(b)(6) to dismiss some of the claims against them and also under Rule 12(f) to strike Calabrese's request for

1

punitive damages against the City, and the Director moves under Rules 12(b)(1) and 12(b)(6) to dismiss the claim against him. Docs. 152, 154, 179. The State's Attorney Defendants' motion is granted, though in part on standing grounds, the Director's motion is denied, and the Des Plaines Defendants' motion is granted in part and denied in part. The case will go forward on Count IV (brought under the Second Amendment) against the Director, and on Counts V and VII (brought under the Fourth Amendment) against the Des Plaines Defendants.

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Calabrese's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013). The facts are set forth as favorably to Calabrese as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth those facts at the pleading stage, the court does not vouch for their accuracy. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384 (7th Cir. 2010).

Before getting to Calabrese's allegations, the court summarizes the state court order of protection proceedings as described by the Appellate Court of Illinois in *Paul v. Calabrese*, 2014 IL App (1st) 130233-U (Ill. App. Aug. 20, 2014) (reported at 2014 WL 4109908, reproduced at Doc. 180-1). *See Ennenga v. Starns*, 677 F.3d 766, 773-74 (7th Cir. 2012) (holding that public court documents are judicially noticeable); *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th

Cir. 1994) (same, and collecting cases). Mary Paul, Calabrese's birth mother, gave him up for adoption in 1987. *Paul*, 2014 IL App (1st) 130233-U, at ¶ 6. Calabrese located Paul in September 2010 and attempted to establish a relationship with her. *Ibid*. Paul initially was receptive, but she did not want as close a relationship as Calabrese did. *Id*. at ¶ 7.

In July 2011, after Calabrese persisted in contacting her, Paul sought an order of protection. *Ibid*. Her petition alleged that Calabrese was verbally abusive, had contacted her hundreds of times via email, text message, and phone, and had begun to email her employees and clients, accusing her of abandoning him at birth. *Id*. at ¶¶ 7-8. The Circuit Court of Cook County entered an emergency order of protection on July 29, 2011. *Id*. at ¶ 9. Calabrese agreed to a two-year order of protection on September 28, 2011. *Id*. at ¶ 10.

Over a year later, in late 2012, Calabrese filed a series of *pro se* motions to vacate the order of protection, which the court denied. *Id*. at ¶¶ 11, 15; *see also* Doc. 156 at ¶¶ 27-28. Calabrese appealed in January 2013. *Paul*, 2014 IL App (1st) 130233-U, at ¶ 16; *see also* Doc. 156 at ¶ 29. In March and April 2013, Calabrese continued to file motions in the trial court as it prepared the appellate record. *Paul*, 2014 IL App (1st) 130233-U, at ¶¶ 18-20. In August 2014, the Appellate Court of Illinois upheld the order of protection, which had been extended beyond its original two-year term. *Id*. at ¶ 32.

Calabrese's allegations in this suit are as follows. On May 9, 2013, while his appeal was pending, three of our defendants—Des Plaines police officers Victoria Poklop and Scott Moreth, and Cook County Assistant State's Attorney Andreana Turano—met in the Cook County Courthouse in Skokie and conspired to arrest Calabrese and prosecute him for stalking in retaliation for his contesting the order of protection. Doc. 156 at ¶¶ 11-12, 32. The next day, three other defendants—Des Plaines police officers Michael Heene, Charles Akin, and Jennifer

3

DePastors—joined the conspiracy. *Id*. at ¶ 33. On May 13, Heene and DePastors arrested Calabrese and placed him in jail. *Id*. at ¶ 34.

While Calabrese was jailed, DePastors met with Paul and yet another defendant, Cook County Assistant State's Attorney Glen Runk, and further conspired to charge Calabrese with stalking for "filing numerous motions" in the protective order case. *Id*. at ¶ 36. Also during that time, Heene, DePastors, Poklop, and Akin listened in on Calabrese's phone call with his adoptive mother and obtained the password to his email account. *Id*. at ¶ 40. The officers gave the password to Paul and, on May 28, directed her to access Calabrese's email, download private documents, and forward the documents to them. *Ibid*.

A bond hearing in the state criminal case was held on June 5, 2013. *Paul*, 2014 IL App (1st) 130233-U, ¶ 21. The prosecutor maintained that Calabrese had filed his motions in order to "forc[e] Paul to appear in court as a way to get around the order of protection." *Ibid.* According to the prosecutor, the filings "include[ed] extra documents that had nothing to do with the issues on appeal but that contained personal information about Paul and her marriage," as well as "pictures of Paul's dead relatives and their tombstones." *Ibid*. The prosecutor also asserted that Calabrese had sent Paul's attorney "thousands of pages of emails" and "two bound books of over 300 pages of filings and motions, including phone records, e-mails, ancestral information on Paul's family and other personal documents" as part of a "deluge and bombardment of information and harassment." *Ibid*. (internal quotation marks omitted).

In July 2013, Heene gave grand jury testimony that falsely accused Calabrese of attempting to extort money from Paul and of filing court papers and sending materials to Paul's attorney that were unrelated to the order of protection. Doc. 156 at ¶ 43. The grand jury indicted Calabrese on one count each of aggravated stalking, stalking, and cyberstalking. *Id*. at ¶ 44.

While Calabrese was awaiting trial on the criminal charges, another defendant, Cook County Assistant State's Attorney Melissa Howlett, who was assigned to prosecute the criminal case, repeatedly lied to the court in an effort to revoke Calabrese's bond. On September 20, 2013, Howlett maintained in court that Calabrese was emailing Paul's clients "with threatening information," that he had sent a letter to a Cook County Jail inmate with personal information about Paul and her attorneys, and that he had defied a court order by continuing to file *pro se* motions contesting the protective order. *Id*. at ¶¶ 49-52. On December 4, 2013, Howlett told the court that Calabrese was violating his bond conditions by living at his apartment rather than at his adoptive parents' house. *Id*. at ¶ 54.

In June 2014, after a heated email exchange, Calabrese sent Howlett, her supervisors, and her coworkers emails accusing Howlett of lying about the conditions of his bond. *Id*. at ¶ 55. On June 6, 2014, Howlett arranged for a bond revocation hearing as retaliation for Calabrese's accusation that she had lied about his bond. *Id.* at ¶ 56. After the hearing, Calabrese was placed on electronic monitoring for over two months. *Ibid.*

In May and June 2014, Calabrese filed requests for public records under the Illinois Freedom of Information Act, attempting to uncover the basis for Howlett's accusations against him. *Id*. at ¶ 57. In December, Calabrese sued the Cook County State's Attorney Office in state court for refusing to disclose any records. *Ibid.*. Howlett then arranged for another bond revocation hearing, which again resulted in Calabrese being placed on electronic monitoring for over two months. *Id*. at ¶ 58.

At some point, the stalking and cyberstalking charges were dismissed in the criminal case. *Id*. at ¶ 58. On August 17, 2016, the state court acquitted Calabrese of the remaining charge, aggravated stalking, but convicted him of an uncharged misdemeanor count of violating

the order of protection; the conviction was based on Calabrese's contacting Paul's attorneys during the state court order of protection proceedings. *Id*. at ¶ 46. Calabrese was sentenced to two years' probation, and the court entered another two-year order of protection. *Ibid*.

## Discussion

I.      **Counts I-III: Constitutional Challenge to Illinois Law Regarding Harassment**

The Illinois Domestic Violence Act allows a court to issue an order of protection to prohibit an individual's "harassment" of another. 750 ILCS 60/214(b). The Act defines "harassment" as "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner." 750 ILCS 60/103(7). Although the parties never expressly say so, it would appear that Paul's order of protection against Calabrese prohibited him from harassing her and that he was convicted of violating the order of protection for (in the state trial court's estimation) doing just that. *See* 750 ILCS 5/12-3.4(a) ("A person commits violation of an order of protection if [h]e or she knowingly commits an act … prohibited by a court … in violation of [] a remedy in a valid order of protection.").

Counts I-III of the operative complaint allege that the Domestic Violence Act's (and thus the order of protection's) prohibition of "harassment" violates the First and Fifth Amendments, both facially and as applied to Calabrese. Doc. 156 at ¶¶ 70-84. Calabrese seeks a declaration that this prohibition violates the federal constitution's free speech and due process guarantees, and also an injunction against the State's Attorney of Cook County (Kimberly Foxx, an official capacity defendant here) undertaking any future prosecution for violating the prohibition. *Id*. at p. 28. The State's Attorney contends that Counts I-III are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), which precludes a § 1983 plaintiff from bringing a claim that, if successful, "would necessarily imply the invalidity of his conviction or sentence." *Id*. at 487. Calabrese responds

that he "is seeking only prospective injunctive relief," which he says would not be fatally inconsistent with his prior conviction. Doc. 185 at 3.

If the court reached the *Heck* issue, Calabrese's facial challenge would be barred by *Heck*, for if the Domestic Violence Act's prohibition of "harassment" is void on its face, then his conviction for violating the order of protection by engaging in harassment was necessarily invalid. *See Clarke v. Stalder*, 154 F.3d 186, 190 (5th Cir. 1998) (en banc) (in holding that *Heck* barred the plaintiff's challenge to the constitutionality of a prison rule of which he was convicted, explaining that a "[c]onviction based on an unconstitutional rule is the sort of obvious defect that, when established, results in nullification of the conviction"). It is less clear whether *Heck* would bar his as-applied challenge. According to the complaint, Calabrese's conviction was based on the state court's finding that his sending voluminous emails and other materials to Paul's attorneys constituted "harassment." Doc. 156 at ¶¶ 46, 91. The activities that Calabrese wants to pursue in the future for which he fears being prosecuted as violative of the renewed order of protection's prohibition of harassment—"filing proper court documents, issuing and serving subpoenas," and "requesting public records," *id*. at ¶¶ 59, 66—are sufficiently different from the conduct (allegedly) underlying his conviction that sustaining a constitutional challenge to the Domestic Violence Act's application to those activities would not necessarily call into question the conviction. So *Heck* likely would not bar his as-applied challenge.

But the court will not reach the *Heck* issue because, for the very reason (the difference between the conduct for which Calabrese was convicted and the conduct in which he now wishes to engage) that *Heck* likely does not bar his as-applied challenge, Calabrese lacks standing to request a declaratory judgment and an injunction against future enforcement of the order of protection. Although the State's Attorney does not raise the issue, standing is a jurisdictional

7

defect that the court must raise *sua sponte*. *See Hay v. Ind. State Bd. of Tax Comm'rs*, 312 F.3d 876, 879 (7th Cir. 2002). And the court must resolve the standing issue first and may reach *Heck* only if there is standing. *See Okoro v. Bohman*, 164 F.3d 1059, 1061 (7th Cir. 1999) (holding that "jurisdictional issues should be addressed first and if they are resolved against jurisdiction the case is at an end and there is no occasion to address the merits"); *see also Bolick v. Sacavage*, 617 F. App'x 175, 177 (5th Cir. 2015) (holding that *Heck* is not among the threshold issues that *Sinochem International Co. v. Malay International Shipping Corp.*, 549 U.S. 422 (2007), allows a court to reach before addressing subject matter jurisdiction) (citing *Polzin v. Gage*, 636 F.3d 834, 837 (7th Cir. 2011), for the proposition that the *Heck* doctrine is not jurisdictional).

"To have standing, a plaintiff must allege and ultimately show: (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017). When a plaintiff seeks prospective injunctive relief against being subject to criminal or regulatory enforcement, a "credible threat of enforcement" can qualify as an injury in fact. *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014). To establish a credible threat of enforcement, a plaintiff must allege: (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest"; (2) that the conduct is "arguably proscribed by the statute"; and (3) establish a substantial threat of enforcement, which can often be shown by a "history of past enforcement." *Id*. at 2343-45.

Calabrese claims that his conviction for sending the voluminous emails and other materials to Paul's attorney makes him "fearful" that "legitimate and legal filings may constitute illegal 'third party' communications" for which he will be prosecuted. Doc. 156 at ¶ 63. Even accepting Calabrese's representation that his conviction rested solely on his sending materials to

Paul's attorney, nothing about the conviction suggests that the State's Attorney would prosecute him for making proper court filings and public record requests, or that the Illinois courts would consider such conduct to be harassment. As noted, the Domestic Violence Act defines harassment as "knowing conduct which is not necessary to accomplish a [reasonable] purpose" and "would cause a reasonable person emotional distress." 750 ILCS 60/103(7). The court will assume without deciding that a prosecutor and court could fairly conclude that sending Paul's attorney "thousands of pages" of emails with irrelevant and personal information attorney was not necessary to accomplish any reasonable purpose, and that Paul was likely to learn about the emails (which followed months of unnecessary communications to her and her clients) and be distressed by them, especially because many of the court filings that Calabrese sent to the attorney contained irrelevant personal information about Paul and her family. 2014 IL App (1st) 130233-U, ¶ 21. Even granting that assumption, "legitimate" court filings and record requests—which, being legitimate, will not contain irrelevant and invasive personal information—are obviously necessary to litigate a case or obtain records, and thus are materially different from the conduct (allegedly) underlying Paul's conviction.

In light of the differences between the conduct that the state court found to constitute "harassment" and the conduct in which Calabrese wishes to engage, his fear of prosecution is not supported by a plausible reading of the Act or a history of past enforcement. *Cf. In re Marriage of Young*, 990 N.E.2d 788, 794-95 (Ill. App. 2013) (holding that a husband's creation of browser history including child pornography sites on a computer used by his wife and children did not constitute harassment because the husband could not have been "practically certain" that his action would cause emotional distress). Because the threat of prosecution for making legitimate court filings and record requests is "merely conjectural," *Simic*, 851 F.3d at 738 (internal

9

quotation marks omitted), Calabrese lacks standing to request an injunction against future enforcement of the harassment prohibition. The same holds for his request for declaratory relief. *See Ezell v. City of Chicago*, 651 F.3d 684, 694-97 (7th Cir. 2011) (considering requests for declaratory and injunctive relief together for standing purposes, in the context of a pre-enforcement challenge).

Counts I-III accordingly are dismissed for want of subject matter jurisdiction. Given this disposition, it is unnecessary to address the State's Attorney's argument for *Younger* abstention.

## II.     Count IV: Second Amendment Claim Against Director Schmitz

The Illinois Firearm Owners Identification Card Act, 430 ILCS 625/0.01 *et seq*., provides that a person seeking to acquire or possess a gun in Illinois must obtain a Firearm Owner's Identification ("FOID") Card from the Department of State Police. *See* 430 ILCS 65/2(a)(1). The Act renders Calabrese ineligible for a FOID card because he is "subject to an existing order of protection," 430 ILCS 65/8.2, and also because he "has been convicted within the past 5 years of … violation of an order of protection," *id*. § 8(k). Count IV, brought against Director Schmitz in his official capacity, alleges that these restrictions violate the Second Amendment as applied to Calabrese. Doc. 156 at ¶¶ 85-94.

### A.     Ripeness

Schmitz first argues that Calabrese's Second Amendment claim is not ripe because he has not actually applied for a FOID card; Calabrese responds that any application would be futile. "Ripeness is predicated on the central perception that courts should not render decisions absent a genuine need to resolve a real dispute." *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 759 (7th Cir. 2008). Distinguishing between "a controversy in the Article III sense and an abstract question of law" is often difficult, especially where, as here, the plaintiff seeks preemptive relief under the

Declaratory Judgment Act. *Ibid.* The central question "is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Ibid.* (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)); *see also id*. at 766 (considering ripeness of request for preemptive injunctive relief using the same analysis). Two criteria govern whether a controversy is "of sufficient immediacy and reality": (1) "the fitness of the issues for judicial decision"; and (2) "the hardship to the parties of withholding court consideration." *Id*. at 759 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). Under these criteria, Calabrese's Second Amendment claim is ripe.

First, the claim is fit for judicial decision. An issue is not fit for decision where the plaintiff's injury "depends on so many future events that a judicial opinion would be advice about remote contingencies," *Rock Energy Coop. v. Vill. of Rockton*, 614 F.3d 745, 748 (7th Cir. 2010), or where the claim's proper resolution turns on uncertain future developments, *see Wis. Cent.*, 539 F.3d at 760. Here, by contrast, the injury Calabrese complains of is certain to occur. No one disputes that, because Calabrese is subject to an order of protection, Illinois law would require the Department to deny his application for a FOID card. *See* 430 ILCS 65/8.2 ("The Department of State Police *shall* deny an application [for a FOID card] … if the Department finds that the applicant … is … subject to an existing order of protection.") (emphasis added). Section 8(k)'s rule stripping FOID-card eligibility from individuals convicted within the prior five years of violating an order of protection is not quite as absolute, for in "extraordinary cases," the Director may grant a FOID card to an applicant who is otherwise ineligible under § 8. *Hiland v. Trent*, 868 N.E.2d 396, 399 (Ill. App. 2007); *see* 430 ILCS 65/8 (stating that "[t]he Department of State Police *has authority to* deny an application [for a FOID card]" for the

11

reasons enumerated in § 8). But there is no reason to think that the Director would deem Calabrese's case "extraordinary"; in any event, even putting aside § 8(k), § 8.2 renders Calabrese categorically ineligible for a FOID card. Calabrese need not make the futile gesture of applying for a FOID card to establish ripeness. *See Hamilton v. Pallozzi*, 848 F.3d 614, 620-21 (4th Cir. 2017) (holding that individual barred by state law from obtaining a firearm permit need not apply to establish ripeness); *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012) ("Failure to apply for a license would not preclude Decastro's challenge if he made a substantial showing that submitting an application would have been futile.") (internal quotation marks omitted).

Nor are there any unresolved contingencies that might affect how a court would assess Calabrese's claim. His argument is that the FOID-eligibility statute is unconstitutional as applied to him because the conduct that led to his conviction and the renewed order of protection was nonviolent. Doc. 183 at 4. All of the facts relevant to that argument lie in the past, and thus none are contingent.

Second, Calabrese would be harmed by delaying decision. The alleged deprivation of his Second Amendment right is ongoing and presumptively harmful. *See Ezell*, 651 F.3d at 699 (holding that "irreparable harm is presumed" when the loss of Second Amendment rights is alleged). This distinguishes Calabrese's claim from the unripe claims in *Wisconsin Central* and *Rock Energy*, where the plaintiffs were merely concerned that the government might bring civil actions against them at some point in the future. *See Wis. Cent.*, 539 F.3d at 760-61; *Rock Energy*, 614 F.3d at 749.

### B. Merits

Schmitz argues in the alternative that Calabrese's Second Amendment claim fails on the merits. Under Seventh Circuit precedent, there are two steps to evaluating a Second Amendment

12

claim. *See Ezell*, 651 F.3d at 701-04.  First, the court asks whether the restricted activity falls within the scope of the Second Amendment.  *Id*. at 701.  Second, if the activity falls within the Second Amendment's scope, the court must assign a level of scrutiny appropriate to the particular regulation and determine whether the challenged regulation is valid.  *See id*. at 706-09 (applying "a more rigorous" standard than intermediate scrutiny, "if not quite strict scrutiny") (internal quotation marks omitted); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (applying intermediate scrutiny).

Schmitz focuses on the first step of the analysis, which "requires a textual and historical inquiry into the [Second Amendment's] original meaning."  *Ezell*, 651 F.3d at 702.  Schmitz argues that because violating an order of protection is a "serious criminal offense," Calabrese falls in the category of "unvirtuous citizens" who traditionally have had no Second Amendment rights whatsoever.  Doc. 195 at 6 (quoting *Binderup v. Attorney General*, 836 F.3d 336, 348 (3d Cir. 2016) (en banc)).  The parties do not present any historical evidence relevant to this issue, and they cite no Seventh Circuit precedent (nor is the court aware of any) explaining what sorts of crimes are so serious that a conviction automatically strips an individual of his or her Second Amendment right to possess a firearm.  But in *Binderup v. Attorney General*, which both parties cite, the Third Circuit held that individuals with nonviolent misdemeanor convictions resulting only in probation retained their Second Amendment rights.  836 F.3d at 351-53.  Calabrese's offense was likewise a misdemeanor that resulted in probation, and he alleges that he never behaved violently towards Paul or anyone else.  Based on the similarity between Calabrese's conviction for violating an order of protection and the convictions at issue in *Binderup*, the court cannot say on the pleadings, without an evidentiary record and with all reasonable inferences drawn in his favor, that his being subject to and having violated an order of protection places him

13

outside the Second Amendment's scope. *See Zedonis v. Lynch*, 233 F. Supp. 3d 417, 428-31 (M.D. Pa. 2017) (holding that the plaintiff adequately stated a Second Amendment challenge to a federal law prohibiting him from owning a firearm due to a misdemeanor conviction for driving under the influence that resulted in "several months" of confinement).

Schmitz responds by observing that the Seventh Circuit in *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc), upheld 18 U.S.C. § 922(g)(9), which forbids individuals convicted of "a misdemeanor crime of domestic violence" from possessing firearms, against a Second Amendment challenge. Schmitz suggests that *Skoien* held that *any* misdemeanor crime of domestic violence is a "serious criminal offense" that leads under the first step of *Ezell* analysis to the categorical loss of Second Amendment rights, Doc. 195 at 6, but it did not. Instead, the Seventh Circuit went straight to the second step of the Second Amendment analysis and determined that the restriction was valid because it was substantially related to the important governmental objective of preventing gun violence. *See Skoien*, 614 F.3d at 641-42. Central to the court's ruling was the fact that predicate "misdemeanor crimes of domestic violence" under § 922(g)(9) must have "as an element, the use or attempted use of force, or the threatened use of a deadly weapon," 18 U.S.C. § 921(a)(33)(A)(ii). *See Skoien*, 614 F.3d at 642. Here, by contrast, there is no indication that Calabrese's nonviolent offense involved the use or attempted use of force or the threatened use of a deadly weapon. On the present record, then, *Skoien*'s determination that § 922(g)(9) satisfies intermediate scrutiny does not necessarily mean that the restrictions on Calabrese's Second Amendment rights are valid.

For these reasons, Calabrese's Second Amendment claim is ripe and survives dismissal at the Rule 12(b)(6) stage.

**III.    Counts V-VII: Illegal Search Claims Against The Des Plaines Defendants**

Counts V-VII allege that the Des Plaines Defendants' search of Calabrese's email account without a warrant violated the Fourth Amendment and its analog in the Illinois Constitution. Doc. 156 at ¶¶ 95-109. The Des Plaines Defendants do not seek to dismiss the Fourth Amendment illegal search claim (Count V), the City of Des Plaines does not seek to dismiss any claims for failure to plead *Monell* liability, and Calabrese concedes that his state constitutional claim (Count VI) should be dismissed. Doc. 185 at 4. That leaves for discussion Calabrese's Fourth Amendment conspiracy claim (Count VII), which alleges that the Des Plaines Defendants conspired to enlist Paul to search his Google account.

The Des Plaines Defendants argue that Calabrese's conspiracy claim should be dismissed under the intra-corporate conspiracy doctrine. The doctrine, originated in the employment law context, holds that "managers of a corporation jointly pursuing its lawful business do not become 'conspirators' when acts within the scope of their employment are said to be discriminatory or retaliatory." *Travis v. Gary Cmty. Mental Health Ctr.*, 921 F.2d 108, 110 (7th Cir. 1994). The Seventh Circuit has extended the doctrine to employment suits against government entities, *see Wright v. Ill. Dept. of Children & Family Servs.*, 40 F.3d 1492, 1508-09 (7th Cir. 1994), and suits against "supervisors and subordinates" (as opposed to managers), *Payton v. Rush-Presbyterian-St.Luke's Med. Ctr.*, 184 F.3d 623, 633 (7th Cir. 1999). The doctrine does not apply when employees are "motivated solely by personal bias," because in such cases "the interests of the corporation [play] no part in the employees' collective action, so the action could not [be] taken within the scope of employment." *Hartman v. Bd. of Trs.*, 4 F.3d 465, 470 (7th Cir. 1993) (citing Restatement (Second) of Agency, § 228 (1958)). More generally, "an independent course of conduct not intended by the employee to serve any purpose of the

15

employer" is outside the scope of employment and thus not subject to the intra-corporate conspiracy doctrine. *See* Restatement (Third) of Agency, § 7.07 (2006).

District courts in the Seventh Circuit have largely declined to apply the intra-corporate conspiracy doctrine to cases alleging police misconduct. *See Salaita v. Kennedy*, 118 F. Supp. 3d 1068, 1085 (N.D. Ill. 2015); *Hobley v. Burge*, 2004 WL 1243929, at *11 (N.D. Ill. June 3, 2004) (collecting cases). As several of those decisions correctly observe, while the doctrine was developed to shield organizations and their employees from conspiracy liability "for routine, collaborative business decisions," meaning acts within the scope of employment, police misconduct often involves rogue activity by a small group of officers. *Hobley*, 2004 WL 1243929, at *11 (quoting *Newsome v. James*, 2000 WL 528475, at *15 (N.D. Ill. Apr. 26, 2000)). That is not to say that the intra-corporate conspiracy doctrine is categorically inapplicable in police misconduct cases. For example, an alleged use of excessive force or an alleged false arrest may fall within the scope of employment, as when officers are ordered to subdue and detain and individual whom a supervisor considers a security threat; in those instances the doctrine may apply. *See Payton*, 184 F.3d at 624-25. But where, for example, a group of officers act independently to frame someone, their actions fall outside the scope of employment and a conspiracy claim can go forward. *See Hobley*, 2004 WL 1243929 at *11; *Newsome*, 2000 WL 528475, at *14-16.

The Des Plaines Defendants' alleged illegal search of Calabrese's Google account would not fall within the scope of their employment, and therefore the intra-corporate conspiracy doctrine does not apply. Calabrese alleges that a group of Des Plaines police officers, acting on their own initiative, conspired to illegally search his Google account as a part of their broader conspiracy to retaliate against him for attempting to have the order of protection against him

16

overturned. Doc. 156 at ¶¶ 32-33, 40-41. In short, he alleges that the officers performed the search out of personal bias against him, not in an effort to further the interests of the City of Des Plaines. Because the alleged conspiracy and resulting search comprised "an independent course of conduct not intended by the employee to serve any purpose of the employer," Restatement (Third) of Agency, § 7.07, the intra-corporate conspiracy doctrine does not defeat Calabrese's Fourth Amendment conspiracy claim.

The Des Plaines Defendants also argue that, insofar as Calabrese's conspiracy claim is predicated on his false arrest claim, it is barred by *Heck*. But the complaint makes clear that Calabrese's conspiracy claim is based only on the alleged illegal search of his Google account. Doc. 156 at ¶ 108. Because a finding that the search violated the Fourth Amendment is not necessarily inconsistent with Calabrese's conviction, *Heck* does not apply. *See Kramer v. Vill. of N. Fond du Lac*, 384 F.3d 856, 862 (7th Cir. 2004) (holding that an illegal search claim was not subject to the *Heck* bar because "a conviction can often stand, despite the fact that police may have obtained evidence without probable cause or a warrant in violation of the Fourth Amendment"). The conspiracy claim will go forward, along with the underlying Fourth Amendment illegal search claim.

## IV. Counts VIII-IX: Retaliation Claims Against Howlett

Count VIII-IX alleges that Assistant State's Attorney Howlett sought to revoke Calabrese's bond in retaliation against his exercise of his free speech rights, violating the First Amendment and its analog in the Illinois Constitution. Doc. 156 at ¶¶ 110-21. Calabrese concedes that these claims are time-barred to the extent they allege pre-June 2014 conduct, Doc. 184 at 11, so the court need only consider his allegations regarding the June and December 2014

bond revocation hearings. Howlett argues that those claims should be dismissed because, as a prosecutor, she is absolutely immune from any claims arising out of her conduct at the hearings.

Under federal and Illinois law, a prosecutor has absolute immunity "for conduct that relates to his [or her] role as an advocate for the state." *Olson v. Champaign Cnty.*, 784 F.3d 1093, 1101 (7th Cir. 2015) (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)); *see also White v. City of Chicago*, 861 N.E.2d 1083, 1088-89 (Ill. App. 2006) (Illinois law) (citing *Buckley*, 509 U.S. at 269). This immunity covers a prosecutor's actions in judicial proceedings, as well as in preparing for such proceedings by, for example, "evaluating evidence and interviewing witnesses." *Buckley*, 509 U.S. at 273. A prosecutor is not immune for actions that are not part of the advocate's role, such as "investigative functions normally performed by a detective or police officer," *ibid.*, or acting as a "complaining witness" by submitting an affidavit in support of an arrest warrant or information, *Kalina v. Fletcher*, 522 U.S. 118, 131 (1997); *see also Olson*, 784 F.3d at 1102-03.

Because she was acting as an advocate at the bond revocation hearings, Howlett enjoys absolute immunity from Calabrese's claims. As Calabrese alleges, Howlett, a state prosecutor, "called" hearings to revoke Calabrese's bond in June and December 2014, and at both hearings she presented argument and evidence on the prosecution's behalf. Doc. 156 at ¶¶ 56, 58. Calabrese asserts that Howlett was somehow acting as a witness at the hearings, but that assertion is unsupported and implausible. When prosecutors act as complaining witnesses, as in *Kalina* and *Olson*, they do something any layperson can do. "Testifying about facts is the function of the witness, not of the lawyer." *Kalina*, 522 U.S. at 510. But a prosecutor's statements from the podium in open court, representing the government at a hearing, are part of her role as a lawyer. *See Bianchi v. McQueen*, 818 F.3d 309, 318 (7th Cir. 2016) (holding that a

18

prosecutor is absolutely immune from "claims premised on allegations that [he] presented false statements to the grand jury and at trial").

Howlett therefore is entitled to absolute immunity under federal and state law, and Counts VIII and IX are dismissed with prejudice. Because the flaw with these claims could not be cured by amendment, the dismissal is with prejudice. *See Tribble v. Evangelides*, 670 F.3d 753, 761 (7th Cir. 2012) ("District courts have broad discretion to deny leave to amend ... where the amendment would be futile.").

## V. Count X: False Arrest Conspiracy Claim

Count X alleges that the Des Plaines Defendants and the State's Attorney Defendants conspired to falsely arrest and imprison Calabrese. Doc. 156 at ¶¶ 122-24. Defendants seek dismissal of this claim under *Heck*.

Like other Fourth Amendment claims such as excessive force and illegal search, false arrest claims are not necessarily barred by *Heck* because they do not "necessarily imply the invalidity of [a] conviction or sentence." *Heck*, 512 U.S. at 487; *see also Booker v. Ward*, 94 F.3d 1052, 1056 (7th Cir. 1996) ("[O]ne can have a successful wrongful arrest claim and still have a perfectly valid conviction."). That said, *Heck* applies to a false arrest claim "if specific factual allegations in the complaint are necessarily inconsistent with the validity of the conviction." *McCann v. Neilsen*, 466 F.3d 619, 621 (7th Cir. 2006); *see also Wallace v. Kato*, 549 U.S. 384, 393-94 (2007) (contemplating that some false arrest claims will be *Heck*-barred).

Here, Calabrese does not assert that the officers lacked probable cause to arrest him. Instead, his false arrest claim simply reiterates the constitutional objections presented in Counts I-III to Illinois law's prohibition of "harassment." Doc. 156 at ¶ 123 ("[Defendants'] false arrest of plaintiff was designed and motivated to deprive plaintiff's civil rights and defeat his lawful

19

appeal of a civil domestic relations action."). Calabrese asks the court to find that the conduct for which he was arrested (and ultimately convicted) is constitutionally protected. That ruling would call into question Calabrese's conviction, and is therefore barred by *Heck*. *See Gordon v. Miller*, 528 F. App'x 673, 674 (7th Cir. 2013) (holding a false arrest claim *Heck*-barred because the plaintiff claimed not the absence of probable cause, but that he had not committed the underlying crime). Count X accordingly is dismissed without prejudice. *See Polzin*, 636 F.3d at 839.

## VI. Punitive Damages

Calabrese agrees that his request for punitive damages against the City of Des Plaines should be stricken. Doc. 185 at 7; *see City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) (holding that municipalities may not be assessed punitive damages under § 1983).

## Conclusion

The State's Attorney Defendants' motion to dismiss is granted, Schmitz's motion to dismiss is denied, and the Des Plaines Defendants' motion to dismiss is granted in part and denied in part. Counts I-III are dismissed for lack of standing; Counts VI, VIII, and IX are dismissed on the merits with prejudice; Count X is dismissed without prejudice under *Heck*; and the request for punitive damages against the City of Des Plaines is stricken with prejudice. The case will go forward on Count IV against Schmitz and Counts V and VII against the Des Plaines Defendants.

November 17, 2017

United States District Judge